Today is number 162116 and 172121, United States v. Francisco Martinez-Mercado. Whenever you're ready, Mr. Gonzales. Yes, Your Honor, I would like to reserve three minutes for a rebuttal. Good morning, Chief Howard and Judge Thompson and Callada. In this case, the main issue is that there it was no color under color of law representation by our clients. Your Honor, the main issue here is that a former police officer at what the time was a police officer and also working for the ATF as a task force agent is accused of stealing from individual. But there was never any representations by him that he was a police officer to the individual or anybody else. I think the main issue is whether the fact that there were two PRPD officers also involved who were in a patrol car allegedly supervising or overlooking the crime being committed, if that makes it under color of law. And I suggest the court that the case law says that it was not under color of law because they were not there for any legal purpose. They were just part of the alleged conspiracy. And the success of the conspiracy depended upon the presence of the police car. I don't know that the success of it depended, but it was a part of the conspiracy, definitely. And the fact that they were acting for their own self-interest and not in any way were they acting for a legal purpose, it was a personal pursuit of them, prevents it from being an action of them for the state. In other words, if you allow that type of participation becomes an action of the state, then every time a police officer is involved in uniform or using a patrol car in any kind of illegal action, then you're blaming the state for the police officer's action. And I don't think that the under color of law is meant to be that way. If you were representing the codependent Lopez, would you be arguing the same thing? I'm not sure I would. But then that's the nature of the beast. The codependent Lopez, who is cooperating with the authorities, was very well labeled to use words like search and seizure when they committed the burglary. But there was nothing about a search and a seizure in this case. This was a typical everyday robbery. There was not a police officer that went into the building. It was allegedly thugs from the street because they stated that Mr. Martinez-Mercado, one, they never saw him go in, and two, they saw the alleged thugs that were with him to go into the apartment. There was no action taken that identified them or where they used their power as police officers to change anything that happened during the robbery itself. Well, wasn't that the purpose of having the car? In other words, they didn't show up in a rented Enterprise Honda. They showed up in a vehicle that indeed had the colors of the law on the vehicle. And I thought they did so so that they could intercept both by radio and otherwise any other police officers or assistants that might be called to the scene. So it does seem like they were marshaling the tools of the state and of their authority as police officers as one of the essential components of the heist. And they did. That was part of their plan. But the fact remains that if you allow police officers that use the resources they may have available because they're police officers for illegal purposes and then blame the state, you give them on the color of law, then you also blame the police department for that. And again, they were acting not for a purpose. That's not under federal law. That's not it doesn't follow the municipality or the agency could not itself be liable merely because a couple of police officers went off. There'd have to be a policy of the state pursuant to which it was done. We're looking here at whether the officers could be liable, aren't we? I again, Your Honor, I think that, yes, that's a component of this crime. The the using of police resources. But I don't think that there was any representation made actually by the persons involved. And that describes it as acting on the color of law. Then you have the issue of was there even actually a robbery committed? Because we had no witness by the government as to whether the robbery was actually committed. We have police reports. We have testimony by the cooperators as to the fact that they got paid from the alleged robbery, but they didn't see anything. They did not participate in going in. We have police officers that investigated the scene that state that the painter called the police to come to report the crime because he was being blamed by the alleged owner or the alleged victim. So we have a little bit of confusion because how can you prove the apartment was in shambles? Things were overturned, broken. Isn't that indirect evidence? That is circumstantial evidence. Yes, yes, Your Honor. That something happened, yes. It is circumstantial evidence. And the phone call, for example, is very strong circumstantial evidence. I grant that much. There's no way of hiding that. But the point is, is that. I'm not understanding your argument. I thought you were saying that there's no evidence of a robbery. Of the robbery, there is circumstantial evidence. But the victim, the one that allegedly was has had his rights violated, did not testify there. We have evidence from other people that say what he said, that he had money robbed, but he did not say it. Well, who cares? Well, I suppose they killed him during the robbery. He wouldn't testify. But then you had evidence that they caused, and then you would allow hearsay. Here, the government did not provide sufficient evidence. Well, there was evidence that they distributed the money. Yes. And they make statements as to the money. Yet there were reports from the police that intervened where the owner, at one point, stated that nothing else was taken but some money and some documents, and later they found the documents. There were also fingerprint reports that showed that there were no fingerprints but those of the owner. We have a missing witness, which is one of the police officers that we requested that be brought in as a witness, as a material witness, and we had subpoenaed her, but she said she was not going to show, because she was hospitalized and we requested a material witness warrant so that she would be forced to come in, and the judge denied it. You know, her testimony, she was the first person that went there and interviewed, and her statements were not allowed to be heard by the jury, and her statement puts in doubt even the robbery. It was also a Brady violation because it was given on the Sunday before the Monday where the trial started, and in spite of the fact that we were able to subpoena her because of her medical condition, she refused to show and the court did not allow us or enforce our right to bring her to the trial, Your Honor. One of the points you raised in your brief was the admission of other or prior bad acts by your client, allegedly. That's correct, Your Honor. What effect did that, let's assume for a moment that the district court shouldn't have allowed in that testimony? How impactful was it or was the evidence strong enough anyhow that we can overlook that as harmless error? Well, Your Honor, the evidence of prior bad acts just basically put the jury into the belief that my client was as bad as these two cooperating witnesses that admitted multiple bad acts, including the ones with my client or alleged. But in the end run, all those bad acts, none of them actually took place, and they admitted that they didn't take place. Oh, we're going to rob a house in Catalina. Oh, well, that never happened. We're going to do a house here. Oh, that never happened. They had Miguel Pagan testify that he had a gut feeling that my client was involved, but when he was cross-examined, he said, no, I didn't overhear the conversation. I don't know what it was all about. So they created an image of abusing bad acts that really did not involve my client. They made reference to a robbery in the airport that my client wasn't even involved in. All these bad acts that they put into the record basically created an atmosphere that this is another corrupt police officer, which is a problem in Puerto Rico, and it biased the jury as to any police officer that might be in front of them. And, you know, we objected. Our objections are on the record. The court found that this was proper. We dispute that to this date, and we believe that the – Counsel, when you objected, did you object solely on the issue of propensity, or did you also object on the 403 question, that even if there was a proper reason for it to come in, it might be unfairly prejudicial? We objected on the 403 also, Your Honor. They go hand in hand.  He did. Or is it implicit? He filed an opinion in order in that regard, stating that he didn't find it prejudicial and therefore that he allowed it as 404B. Again, this was all litigated prior to trial, and we reinforced it at trial when this was brought in by the government. So we believe, again, that the bias could not be cured by anything but a remand on the 404B issue. It was extremely prejudicial. In Puerto Rico, we have a problem of multiple officers having been arrested for corruption, and no matter what we could say. What do you say? Again, you've got to not only convince us that there was an error here in letting it in, but that it wasn't harmless, or the government argues that it's harmless. So what do you say about the cell phone tower location evidence? How do you explain that? I explain that because we had a witness, a sergeant, ex-sergeant, who testified that Mr. Martinez-Mercado had contacted him to find out about a cooperator that he was doing background check. When he was doing the background check, as the sergeant he contacted was no longer in the drug division, he received the name of Pedro Lopez, who was one of the cooperators, and was told, talk to him, he might know. So our client, in his function as an ATF agent, TFO, was contacting Pedro Lopez for that purpose, and it was to meet with Pedro Lopez and organize a meeting to get information on the cooperating witness that they were investigating. I'm sorry to interrupt you, but I have a question about that. Because we read the briefs, you know, the information that you're talking about. The district court ruled that that was not admissible and relevant because of the date that this guy was arrested. And in your brief, you argue that it was mid-investigation, and therefore the phone calls could have been made during the relevant time frame here. But I'm trying to figure out if you made that argument to the district court below. At the district court, when the government asked our client, they gave a date, September 20th. And as it was in our brief, when we looked back at that moment, I don't think we erased it because we were not sure about the date. But at that moment, we looked back, and in the briefs you have information that the arrest was earlier, and that he voluntarily surrendered on that date. So the date that the government offered was not really the proper date when he started cooperating with the authority. Thank you. Good morning, Your Honors. May it please the Court. Julia McIgnatis for the United States. The government presented sufficient evidence that Martinez Mercado conspired to violate the civil rights of the individual who was occupying the Playa Mar 1A apartment. Now, the evidence presented showed that the conspiracy did happen under color of law. Here we have Martinez contact Sergeant Fernandez for the sole purpose of trying to find an individual working in Carolina, which is the area of where the robbery occurred. That was of utmost importance because in order for the plan to succeed, they needed to have an individual who was going to be on duty in a patrol car with access to the radio. But his role did not stop there. Lopez testified that the importance of being on duty at the scene was not only to give that false sense of security that nothing was afoot, but if there was indeed a complaint, he could be the individual that would go to the investigation and then possibly deviate other cops from investigating what was truly happening. So here... Is Lopez in the same position as the defendant here because this is a conspiracy? Oh, I'm sorry, or vice versa. Is the defendant in the same position as Lopez because this is a conspiracy? Yes, ma'am. And in our brief, we cite it to cases where it shows that defendants, even if they personally are not acting under the color of law, if the conspiracy includes individuals that are acting under the color of law, they are indeed liable under 241. And this is a 241 conspiracy case. It wasn't charged as a 242 actual deprivation, although the evidence presented at trial did establish that also. This agreement to do what indeed happened, to sit there, to listen to the police radio, to have the ability to deviate the investigation, was only made possible because Lopez was clothed under the authority of the state. His role, he could only perform this duty by virtue of being an on-duty police officer, and that is the precise reason why he was recruited by Martinez. He didn't recruit any other cop. He didn't recruit a San Juan cop. It was a Carolina cop who was on duty, who would be there at the time, who had a legitimate purpose to be there at the time the robbery occurred. By the very terms of the plan, the success of the operation depended upon this police presence. And additionally, there was sufficient evidence about the conspiracy itself. Lopez testified about his meeting and how it was to enter, to illegally enter, to search, and to seize money, drugs, and jewelry from this ATF arrestee. Despite the fact the occupant of the apartment did not testify, there is plenty of circumstantial evidence on the record to show that there was a known individual. This wasn't a ghost or a theoretical person. We have the plan where Martinez is explaining to Lopez that there's this guy. I think that there's going to be money, drugs, and jewelry in his apartment. I'm going to go in and we're going to take it, this unlawful search and seizure. And what they do is just that. And then the next day, there is a complaint and the police go and investigate. And the evidence of the pictures taken by the technician show forced entry, show that the apartment was ransacked, show that an individual did indeed live there. There were pictures, there were clothes everywhere, there's a bed. There was an individual whose rights were violated by this illegal search and seizure. And for that reason, the government presented sufficient evidence of a conspiracy of this agreement of Martinez with Lopez, a cop who acted under the color of law. Now turning to the court's question about the 404B evidence, the district court here did not abuse its discretion in allowing this evidence because the evidence not only had special relevance, but it was not overly prejudicial considering all of the other evidence that was there at the time. Using an on-duty... How do you define the special relevance? Yes, ma'am. Using the on-duty officers in a patrol car shows that it's knowledge, it's preparation, it's the intent and the plan of these conspiracies. Also, all of the targets of these conspiracies, the police acquired using their law enforcement background. So you've got a couple of factors, but the other planned heist involved officers showing up in uniforms and barging in the door. There's nothing remotely like that here. Our case law requires that there not just be some similarities, it requires a high or almost striking degree of similarity so that we have a sort of modus operandi. And you're always going to have a few factors in every single defalcation involving police on duty. There's likely to be a car or a uniform somewhere. Your Honor, admittedly, the entering of the apartments in these two situations are different. The government acknowledges that. But, however, the preparation, the conspiracy, the using the car to deviate the investigation, to have the individual, they testified that they were going to execute this false or no warrant in the case of the Santurce Barrio Obrero house, but a car was supposed to be on the street to deviate if other cops were coming. Also, the knowledge, how did they get these plans? The knowledge was based on their virtue of being law enforcement because these conspiracies targeted individuals who would not complain. Just like a drug dealer would not call the cops to say someone stole my drugs and money, in this situation the knowledge of who to target was always a result of that law enforcement background and investigation. But in any event, even if it were error, there was plenty of evidence to make such that the court's decision harmless. Here we have the testimonies of Ramos and of Lopez. But it's not just their testimonies. Individuals who admittedly were heavily cross-examined and admitted to prior having lied on the stand and the jury was able to assess their credibility. Part of the reason, presumably, the jury assessed their credibility is that their story was corroborated by independent evidence that does not lead to being able to alter the cell site records, the phone records, the phone records that show exactly what Lopez testified. That on a certain date, Martinez called Fernandez. Fernandez called Lopez. Then Lopez says yes. Martinez calls Lopez. Lopez calls Ramos. All of that story is backed up by the records. Then on the night of the robbery, between 7 and 11 p.m., we have 19 phone calls between these two individuals, the on-duty cop and the mastermind. Then the cell site data shows that those two individuals were in that same area of Isla Verde. All of that was sufficient evidence, was more than sufficient evidence for the jury to conclude that this indeed happened and to credit these individuals' testimony. And because of that, because the evidence of what happened the night of the 23rd and the planning beforehand and how it was corroborated was so strong, even if the court erred in allowing this 404B evidence, any such error was indeed harmless, although the government argues that it was properly admitted. With respect to the strength of the telephone call evidence, the court did not allow the evidence to come in that Martinez was verifying information with respect to another individual. Had that information been admitted, wouldn't that have made it ever so slightly less probable that the government's case was so strong? Well, Your Honor, to clarify, I take issue a little bit with what the court said because part of that testimony was indeed allowed through Sgt. Fernandez. Sgt. Fernandez did indeed testify that he received a phone call from Martinez to verify the credibility of a potential ATF cooperator. That testimony was presented to the jury, and Sgt. Fernandez had the personal knowledge that indeed he received this phone call. The problem was he said it was in November, not in September. But what about Torres? Yes, Your Honor. Now, Torres, his proffered testimony, the way that he came to give the proffered testimony as opposed to testifying in front of the jury, was the way that the defense had presented the Tuohy letter. The Tuohy letter was that it was going to be for character evidence, and it said it may come that they need to testify about a certain incident. At trial, the court asked, what is this testimony? Is it character testimony? And the defense attorney specifically tailored the proffer to say, no, Your Honor, this individual is going to testify that Martinez was going to make a phone call. We're going to give the jury an alternate theory to explain these phone records, and we're going to show that it's because he wanted to test the veracity of this Pablo Vieira, and we're going to show that. The government at that point said, we don't know if this is based on personal knowledge or if this is hearsay or if this could be a defendant's self-serving statement. I told you that I called so-and-so. It wasn't clear whether that testimony was going to be based on personal knowledge. So the court heard the testimony outside the presence of the jury. The first ATF agent, Gene Rivera, testified that these phone calls happened, but he didn't know anything about them. So he heard them through the grapevine, which would have been hearsay testimony. Then Julio Torres also testified that there was an investigation of an individual who was arrested in September. He stated September of 2010. That they were going to investigate the background of him, and that phone calls could have been made. He didn't tell them how to investigate, but that Martinez was going to investigate. He stated that he didn't know to whom the phone calls were made. He wasn't present, and he didn't hear them. So then on cross-examination, the government that knew that the ATF arrest, and it's not disputed that the ATF arrest was on the 20th, asked to clarify. So was his cooperation after the ATF arrest on September 20th? Then he said yes. He said yes in early September. But then the government said he was arrested on September 20th, correct? Correct. So was his cooperation after September 20th? And that is when Julio Torres said yes. I thought he said yes early September. It is my understanding, Your Honor, that in direct he had said early September, but then on cross-examination when the government said, well wasn't his arrest on the 20th? Yes. So would his cooperation would have been after September 20th? Yes. And it was based on that the government made it. It makes it conflicting testimony, but it doesn't make it inadmissible testimony. Well, it was also that this individual had no personal knowledge as to whether these phone calls were made. The district court then denied it without any argument by the party. There's direct examination, there's the proffered cross, and then the ruling. So the parties did not argue this notion in the brief that the government intentionally induced the court to error. That didn't happen. The government's argument was tailored to Sergeant Fernandez, the witness, and it made that argument after this was denied in this case. But at the end of the day, whether the phone calls were made, that testimony wouldn't have been allowed to come to the jury because Julio Torres didn't know that. If anything, he would have limited it in saying that there was an investigation which did come through Sergeant Fernandez because he testified that he had no personal knowledge of these telephone calls. He didn't presence them. There was no witness there. And it was the district court that at that time. A witness may not have the whole story, but a witness can have a piece of the story while another witness can have the rest of the story to tie it in. Undoubtedly, Your Honor. But at the end of the day, that story, when Sergeant Fernandez testified, it also became irrelevant because he said that it was after in November when this happened in September. And if indeed he started cooperating September 20th, phone calls that made September 15th would not have been relevant. Would your point on that change at all if when the government cross-examined Torres and said after September 20, Torres' response was yes, that's what I said early September 2010. Does that change anything for you? Your Honor, my reading of the transcript is that he was adamant that the cooperation happened after his arrest. And if the arrest was on September 20th, it would not change our posture. I don't see how September 20th, not to be parsing here, but is early September anyway. But his testimony was early September. That was his testimony. His testimony was early September, but the fact of the matter was he was arrested by ATF on September 20th. Being by the government isn't the evidence. It's the response that's the evidence. Your Honor, well, if that were the case, if that was the one question that should have been allowed, again, I don't see how it could have fixed the outcome of the proceedings here when then if that was that one piece that he could have presented and there was no other issue that that individual could have indeed said, let's assume that that question should have been allowed in front of the jury. Because it was relevant? If it was before the 20th, then it could have been relevant. But the court made the decision that he had no at least personal knowledge of the phone calls. The only thing that would have happened afterwards is Sergeant Fernandez's testimony that I received a phone call in November. And then when you take that to the phone calls, I think the jury, looking at the credibility and the fact that on the night of the robbery, are you going to call your individual, Lopez, 20 different times, excuse me, 19, between 7 p.m. and 11 p.m. when a robbery is happening to keep asking him, is this person credible, is this person credible, is this person credible, that that theory, the evidence itself discredited. And to the extent that they were able to present it, if I may just finish my sentence, to the extent that they were able, that Sergeant Fernandez was able to testify and was saying that I did indeed receive this call, that was presented to the jury. And even though the times were not appropriate, it was also argued by the defense in their closing. Thank you. To follow with where you were heading, I believe, is that the whole story for our defense, that this was a proper phone call made following his investigation of Pablo Vieira, the testimony of all three, that is the two ATF agents and the sergeant, would have established the whole story. That story being that in the fulfillment of his obligations as an ATF agent, he was conducting a background check, and that's why he was communicating with Pedro Lopez. But the chronology is the pivotal issue here, because as I read the proffer, the only evidence as to when the date of the arrest was was September 20. Correct. And no one argued, offered any evidence that, in fact, it was prior to 20. And the calls took place prior to the 20th. Correct. And the reason for that is that, frankly, we didn't know when Pablo Vieira had been arrested until the government proffered the date of September 20th. So we didn't know that there was a history behind it. The whole purpose of this testimony from the defense side as presented to the court was to show that your client had a reason to be calling these fellows. Exactly. A legitimate reason. The problem, though, is that the reason that you gave came into existence, it seems, on September 20th, and the calls were made prior to September 20th. So there's a mismatch. And the mismatch comes in from the fact that we find out later that Pablo Vieira had been already in talks with the government from before, and he voluntarily surrendered, and I believe that's in a brief. He surrendered. But you didn't present that at the proffer. I understand that. I agree. We did not. It's not a preserved issue. I understand that. But the fact is that the whole story might have come out if they had allowed Julio Torres and the other ATF agent to testify together with Mr. Fernandez, the sergeant. Also, going back to the answer from the government, again, they use words like search and seizure. This is not a search and seizure situation where they had a warrant where they could go in. This is a flat-out robbery, and there is no governmental interest. It was a flat-out seizure. Illegal seizure, yes. So I would suggest that the undercover law is really one of the big issues, but the 404-B and the 403 argument is extremely relevant because it created – and consider this, if the agents, special agents of ATF had testified on behalf of Mr. Martinez Mercado, the jury might have also understood that they believed that Mr. Martinez Mercado was doing what he was supposed to be doing and not doing what these corrupted police officers did. We also have to address the issue that these false officers later were shown or there's evidence to be shown that they might have lied, which is part of our brief. And this is also something that needs to be resolved by the circuit as to whether they remain on that issue. Thank you. I'm sorry. This is the request for a hearing about Vasquez. That is correct. I just want to make sure I know what you're talking about. Yeah. Thank you.